U.S. BANKRUPTCY COURT
DISTRICT OF OREGON
**F I L E D**
**July 09, 2007**
**Clerk, U.S. Bankruptcy Court**

**Below is an Order of the Court.**

RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: | ) Bankruptcy Case |
| | ) No. 07-30315-rld13 |
| JESSE ROBERT FLEISHMAN and IVONNE | ) |
| RAQUEL FLEISHMAN, | ) MEMORANDUM OPINION |
| | ) |
| Debtors. | ) |

In this case, the parties seek a determination as to whether the debtors' unborn child is a member of their household. Resolution of this issue bears directly on the duration of the debtors' plan in chapter 13, as the size of their household in relation to their combined income determines whether the debtors' family income is above or below the median for purposes of establishing the "applicable commitment period" for plan payments under the Bankruptcy Code. I conclude: (1) for purposes of calculating the "applicable commitment period," the debtors' household does not include unborn children, and (2) the "applicable commitment period" is determined as of the plan confirmation date. My reasons follow.

///

Page 1 - MEMORANDUM OPINION

## Factual Background

The facts are undisputed. Jesse R. and Ivonne R. Fleishman ("Debtors") filed their chapter 13[1] bankruptcy petition on February 1, 2007. The Debtors stated on their Schedule I, filed February 14, 2007, that they had a one and one-half year-old son, but were expecting another child on or about June 27, 2007.

Also on February 14, 2007, the Debtors filed their B22C "Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income" ("B22C"). In calculating the "applicable commitment period" for plan purposes in the B22C, the Debtors listed their household size as four, based on the fact that their unborn child would be a part of their household from June 2007 through the remaining life of their chapter 13 plan. On the same date, the Debtors filed their chapter 13 plan ("Plan"), estimating the approximate length of the Plan at 58 months in order to pay secured debt obligations.

On March 13, 2007, the chapter 13 trustee ("Trustee") filed an objection to the Plan, based, in part, on the household size of four set forth on the B22C. The Trustee filed a supplemental objection on May 17, 2007, arguing that the "applicable commitment period" for Plan purposes should be 60 months, rather than 36 months, as calculated on the B22C.

The Debtors' combined annual income, as calculated and set

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, incorporating the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, April 20, 2005, 119 Stat. 23 ("BAPCPA"), as the Debtors' chapter 13 petition was filed after the general BAPCPA effective date (October 17, 2005).

Page 2 - MEMORANDUM OPINION

forth on their B22C, is $61,945.00. If the Debtors' unborn child is not included as a member of their household, the household size is three, for which the Oregon median income is $55,104.00. If their unborn child is considered a member of their household, the household size is four, for which the Oregon median income is $63,946.00.

After briefing by the parties, the matter was heard on June 7, 2007. At the hearing, I listened to argument and took the matter under advisement.

### Jurisdiction

I have jurisdiction to consider and rule on the Trustee's objections to the Plan as "core" matters under 28 U.S.C. §§ 1334 and 157(b)(2)(L).

### Issues

Whether an unborn child is a member of the Debtors' household for purposes of determining the applicable median family income in calculating the "applicable commitment period."

Whether household size is determined as of the petition date, as of the date of confirmation of a chapter 13 plan, or on some other date(s) for purposes of determining the "applicable commitment period."

### Discussion

Deciding the issues before me requires consideration and interpretation of provisions of a number of sections of the Bankruptcy Code. In this context, it is important at the outset to state what I am <u>not</u> determining in this case. At oral argument, I specifically asked counsel for both parties if they were looking for a decision on the impact of the Debtors' impending blessed event on their "projected

Page 3 - MEMORANDUM OPINION

disposable income," for § 1325(b)(1)(B) purposes. Both parties stated that "projected disposable income" was not a matter in dispute, at least at the time of the hearing. Accordingly, I leave that issue for another day, although the case clearly is pregnant with it.

The issue that I must decide is the appropriate applicable commitment period for the Plan. The term "applicable commitment period" is introduced in § 1325(b)(1), which provides in relevant part

> If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, <u>as of the effective date of the plan</u>–
> . . .
> (B) the plan provides that all of the debtor's projected disposable income to be received in the <u>applicable commitment period beginning on the date that the first payment is due under the plan</u> will be applied to make payments to unsecured creditors under the plan.

(Emphasis added.)

"Applicable commitment period" is defined in § 1325(b)(4).

> For purposes of this subsection, the 'applicable commitment period'--
>
> (A) subject to subparagraph (B), shall be–
> (i) 3 years; or
> (ii) not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than–
> (I) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;
> (II) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same

Page 4 - MEMORANDUM OPINION

>                    number or fewer individuals; or
>                         (III) in the case of a debtor in
>                    a household exceeding 4
>                    individuals, the highest median
>                    family income of the applicable
>                    State for a family of 4 or fewer
>                    individuals, plus $525 per month
>                    for each individual in excess of 4;
>                    and
>               (B) may be less than 3 or 5 years,
>          whichever is applicable under subparagraph
>          (A), but only if the plan provides for
>          payment in full of all allowed unsecured
>          claims over a shorter period.[2]

The terms "household," "person" and "individuals" used in § 1325(b)(4) are not defined in the Bankruptcy Code. Nor is the BAPCPA legislative history helpful in divining how those terms are to be interpreted.

Consistent with the preamble to § 1325(b)(1), issues as to the appropriate "applicable commitment period" arguably only would arise in situations where the chapter 13 trustee or an unsecured creditor objects to confirmation of the debtor's chapter 13 plan. In this case, of course, the Trustee has objected. However, under the current Federal Rules of Bankruptcy Procedure, all chapter 13 debtors are required to calculate the "applicable commitment period" for their cases and file a document including such calculation on or about the time of filing. See Fed. R. Bankr. P. 1007(c). Interim Rule 1007(b)(6) specifically provides:

> A debtor in a chapter 13 case shall file a statement
> of current monthly income, prepared as prescribed by
> the appropriate Official Form, and, if the debtor has
> current monthly income greater than the median family
> income for the applicable state and family size, a

---

[2] The Plan does not provide for full payment of the allowed claims of general unsecured creditors; so, § 1325(b)(4)(B) does not apply.

Page 5 - MEMORANDUM OPINION

calculation of disposable income in accordance with
§ 1325(b)(3), prepared as prescribed by the
appropriate Official Form.

The relevant Official Form is the B22C, which requires in Part II, Section 16, entitled "Applicable Median Family Income," that the debtor

> [e]nter the median family income for applicable state and household size. (This information is available by family size at www.usdoj.gov/ust/ [the "U.S. Trustee Web Site"] or from the clerk of the bankruptcy court.)

The U.S. Trustee Web Site advises that the information applicable for completing Part II of the B22C "is published by the Census Bureau according to State and family size and is adjusted each year." In fact, "median family income" generally is defined in § 101(39A), added in BAPCPA, as follows:

> The term "median family income" means for any year –
>   (A) the median family income both calculated and reported by the Bureau of the Census in the then most recent year. . . .

A. <u>A household consists of persons living outside the womb</u>.

The U.S. Census Bureau ("Census Bureau") defines "household" as follows:

> A <u>household</u> includes all the persons who occupy a housing unit. A housing unit is a house, an apartment, a mobile home, a group of rooms, or a single room that is occupied (or if vacant, is intended for occupancy) as separate living quarters. Separate living quarters are those in which the occupants live and eat separately from any other persons in the building and which have direct access from the outside of the building or through a common hall. The occupants may be a single family, one person living alone, two or more families living together, or any other group of related or unrelated persons who share living arrangements. (People not

Page 6 - MEMORANDUM OPINION

        living in households are classified as living in group
        quarters.)
        . . .
        <u>House[h]olds with Individuals under 18 years</u> include[]
        not only families with related children but also all
        other households in which a person under 18 is
        present. . . .

The Census Bureau does not define the terms "person" or "individuals." However, consistent with the Census Bureau's functions to gather information from individuals and establishments from which to compile statistics,[3] it makes no sense to interpret "person" or "individual" as including unborn children for purposes of determining how many "persons" occupy a housing unit. For example, some pregnancies terminate before a child is born. Counting such pregnancies as "persons" automatically would build inaccuracies into the statistics the Census Bureau is charged with compiling as accurately as possible.

      Interpreting "households" as not including unborn children is consistent with other authorities under federal law. In computing personal exemption deductions under federal tax law, courts have held that unborn children are not "persons" or "individuals" for exemption purposes. See <u>Wilson v. Comm'r</u>, 41 B.T.A. 456 (Bd. of Tax Appeals 1940):

        The word 'person' as used in section 25(b)(2) is to be
        taken in its normal, everyday sense of a living human
        being, a man, woman, or child, an individual. . . .
        The interpretation which petitioners suggest is so
        obviously strained as to merit little
        discussion. . . . Nor is the fact that, by common law
        and generally by statute, a child en ventre sa mere is

---

[3] Congress created the Census Bureau as a permanent agency of the Department of Commerce in 1902. The Census Bureau takes a census of population every 10 years, but also conducts statistical studies of economic activity and state and local government every five years. Each year, the Census Bureau also conducts more than 100 other surveys.

Page 7 - MEMORANDUM OPINION

> deemed to be in esse for the purpose of inheritance
> for its own benefit persuasive here. The credit here
> claimed is not for the benefit of the child but of the
> parents.

The decision of the Court of Claims in Cassman v. U.S., 31 Fed. Cl. 121 (1994), is particularly useful by analogy in analyzing the issues before me. In Cassman, the taxpayer claimants sought a tax refund based on a claimed dependent exemption for a child that was not born as of the end of the subject tax year. The Court of Claims rejected the taxpayers' claim. Relevant to the argument that the Debtors' unborn child should be considered as a member of the Debtors' household, the Court of Claims considered and rejected the taxpayers' argument that their unborn child should be considered a "resident" of the United States.

> Plaintiffs argue that Jonathan Cassman was a resident
> of the United States prior to his birth because his
> mother was a resident, and they ask the court to take
> judicial notice of the fact that it would have been
> physically impossible for the mother to be a resident
> and her unborn child not to be a resident. This
> argument is without merit. The court cannot justify
> viewing an unborn child as "residing" anywhere. . . .

Id. at 126.

With respect to the administrative difficulties created by recognizing unborn children as "persons" where a live birth ultimately does not result, the Cassman court stated the following:

> [D]efendant argues, to allow a deduction based on
> conception, rather than live birth, would create
> confusion because of the uncertainty regarding the
> date when a particular conception occurs....The court
> agrees with defendant. In doing so, the court is
> concerned with the potential for increased
> administrative burdens both on the I.R.S. and on the
> taxpayers. A live birth, by operation of state and
> local law, results in the issuance of a birth

Page 8 - MEMORANDUM OPINION

> certificate, which is a universally accepted and administratively efficient document of identification. . . . The birth certificate itself demonstrates that plaintiffs have a son. If the court held, as plaintiffs urge, that the dependent exemption was available as of the date of conception, then the exemption would be available for pregnancies that never resulted in live births and the issuance of a birth certificate, including those pregnancies ending in miscarriages, induced abortions, and stillbirths. In the absence of any clear evidence of congressional intent to do otherwise, the court must spare taxpayers and the I.R.S. the administrative burden of establishing that such pregnancies occurred or did not occur.

Id. at 129. There is no intent of Congress reflected either in the language of the Bankruptcy Code, as amended by BAPCPA, or in its legislative history to include unborn children when the terms "household," "person" or "individuals" are used in the definition of "applicable commitment period."

Finally, in Cassman, the court noted that there was nothing in or about the subject statutory provisions that indicated that the terms "person" or "individual" were to be understood outside of common language use.

> The operative word in § 152(a) in the 1954 Code and the 1986 Code is "individual." In its everyday sense, however, the term is synonymous with "person," the latter term being distinguishable only when applied to entities other than natural persons. Certainly, Congress did not intend to change the meaning of the provision when it substituted the word "individual" for "person." The Supreme Court, in considering the rights of the unborn under the Fourteenth Amendment to the Constitution, observed, after reviewing a broad range of common and statutory laws, that "the unborn have never been recognized as persons in the whole sense." Roe v. Wade, 410 U.S. 113, 162, 93 S. Ct. 705, 731, 35 L.Ed.2d 147 (1973).

Id. at 124 n.3. The same can be said with regard to the use of "person"

Page 9 - MEMORANDUM OPINION

and "individuals" in § 1325(b)(4).

As noted in Cassman, in Roe v. Wade, the Supreme Court did not recognize unborn children as having general constitutional rights as "persons."

> In areas other than criminal abortion, the law has been reluctant to endorse any theory that life, as we recognize it, begins before live birth or to accord legal rights to the unborn except in narrowly defined situations and except where the rights are contingent upon live birth.

Roe v. Wade, 410 U.S. at 161. In its most recent decision in the abortion area, the Supreme Court has not altered that fundamental position. See Gonzales v. Carhart, 127 S.Ct. 1610 (2007).

The Debtors have cited a number of cases in the student loan discharge area in support of their argument that the Debtors' unborn child should be considered as a part of their household. These cases generally deal with concerns as to the subject debtors' future prospects to make payments on their student loan debts over time. Accordingly, they are much more relevant to the issue of the Debtors' projected disposable income over the life of the Plan than to a determination of the appropriate "applicable commitment period." See, e.g., Ordaz v. Illinois Student Assistance Comm'n (In re Ordaz), 287 B.R. 912, 920 (Bankr. C.D. Ill. 2002)("With the birth of her second child, [the debtor's] circumstances are not likely to improve any time soon."); Nary v. The Complete Source, et al. (In re Nary), 253 B.R. 752, 761 n.22 (N.D. Tex. 2000)("The bankruptcy court treated the Narys as a family of five because they were expecting the birth of a child in June 2000 and any attempted realistic payment of the debts at issue would necessarily be on

Page 10 - MEMORANDUM OPINION

a long range basis."); Williams v. Missouri Southern State College, et al. (In re Williams), 233 B.R. 423, 429-30 (Bankr. W.D. Mo. 1999); and Kincaid v. ITT Educational Serv., Inc. (In re Kincaid), 70 B.R. 188, 190 (Bankr. W.D. Mo. 1986)("[T]his is one of those rare and unusual cases in which the debtors do not have the current ability to pay and in which the future employment prospects are not promising and their economic future is further clouded by the forthcoming birth of a child.").

Likewise, the cases cited by the Debtors concerning issues of alleged substantial abuse in chapter 7 appear relevant to questions as to the Debtors' projected disposable income rather than to the "applicable commitment period" under the Plan. See, e.g., In re Ryan, 267 B.R. 635, 637 (Bankr. N.D. Iowa 2001)("[T]he U.S. Trustee declined to pursue a motion to dismiss under § 707(b) primarily based on Debtor's pregnancy and marital status. She is single, has a 12-year old child and is expecting a child. Mr. Schmillen points out the cost of day care alone will consume much of Debtor's future disposable income."); and In re Edwards, 50 B.R. 933, 940 (Bankr. S.D.N.Y. 1985)("In view of the impending loss of a second income, it is apparent that projections of future ability to pay based on the present two-income status are inappropriate. Further it can be anticipated that there will be new expenses associated with the anticipated baby."). In any event, in a recent post-BAPCPA decision, in determining whether to dismiss the debtor's chapter 7 case as an abuse under the amended version of § 707(b), the bankruptcy court held that the debtor could not include her unborn child as a member of her household. See In re Pampas, 2007 WL 1485352 (Bankr. M.D. La. May 21, 2007).

Page 11 - MEMORANDUM OPINION

Finally, the Debtors have attached as exhibits to their supporting memorandum references from a number of federal and state programs that specifically include unborn children in determining program eligibility. See Memo in Support of Debtors' Response to Trustee's Objection to Confirmation, Exhibits 1-7. While interesting, these exhibits are no more than consistent with the Supreme Court's determination that legal rights are not accorded with respect to unborn children "except in narrowly defined situations." Roe v. Wade, 410 U.S. at 161. In fact, the exhibit examples highlight, in contrast, that there is nothing in the Bankruptcy Code that specifically recognizes unborn children as "persons" or "individuals" or as members of "households" or suggests that Congress intended to include unborn children for consideration in determining debtors' "applicable commitment periods." In the absence of such specific inclusion, I find that under § 1325(b)(4), in defining "applicable commitment period," Congress considered households of living persons only, not including unborn children.

B. The "effective date of the plan" under § 1325(b)(1) is the plan confirmation date.

As noted above, under § 1325(b)(1), the "applicable commitment period" is determined "as of the effective date of the plan." Although the term "effective date of the plan" is used in a number of Bankruptcy Code provisions (see, e.g., §§ 1225(a)(4), 1225(a)(5)(B)(ii),1325(a)(4), 1325(a)(5)(B)(ii) and 1325(b)(1)), it is not defined in the Bankruptcy Code, and the legislative history of the Bankruptcy Code is not helpful

Page 12 - MEMORANDUM OPINION

in shedding much light on the intent of Congress in using the term in its multiple settings.

In these circumstances, it perhaps is not surprising that courts have come to very different conclusions as to the meaning of the "effective date of the plan" in different contexts. Section 1325(a)(4), which sets the "best-interests-of-creditors" test for payments to unsecured creditors in order to confirm a plan in chapter 13, provides:

> [T]he value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date. . . .

Most courts deciding "best-interests-of-creditors" test issues in chapter 13 have considered a hypothetical liquidation of the debtor's assets in chapter 7 as of the petition date, and consequently have determined that for purposes of § 1325(a)(4), the petition date, in effect, is the "effective date of the plan.". See K.M. Lundin, Chapter 13 Bankruptcy Vol. 2, § 160.1 at p. 160-1 (3d ed. 2000 & Supp. 2004). The rationale for these decisions is that the rights of creditors with respect to assets of the debtor, including applicable exemptions and potential preference and avoidance recoveries, are determined as of the petition date. See, e.g., Hollytex Carpet Mills v. Tedford, 691 F.2d 392 (8th Cir. 1982); In re Green, 169 B.R. 480, 482 (Bankr. S.D. Ga. 1994); and In re Statmore, 22 B.R. 37 (Bankr. D. Neb. 1982). But see Education Assistance Corp. v. Zellner, 827 F.2d 1222, 1225 (8th Cir. 1987)(Quoting Collier's, "[t]he date of the valuation of the property to be distributed under the plan, as well as the date as of which the conceptualized

Page 13 - MEMORANDUM OPINION

chapter 7 liquidation is to have taken place, are one and the same; both relate to the effective date of the plan. . . . Of course, the effective date of the plan cannot be antecedent to the confirmation hearing at which the issues raised by section 1325(a)(4) are to be heard by the court.").

The language of § 1225(a)(4), which establishes the "best-interests-of-creditors" test in chapter 12, is identical to the language of § 1325(a)(4). However, most courts deciding "best-interests-of-creditors" test issues in chapter 12, in contrast, have applied the chapter 7 hypothetical liquidation test as of the plan confirmation date. The reasoning of these decisions is based on the courts' conclusions that applying the "best-interests-of-creditors" test on the date when the chapter 12 plan is binding on the debtor and creditors is consistent with the language of the Bankruptcy Code and properly serves the purpose of chapter 12 to insure that creditors receive a "fair" deal under the debtor's plan.

> The nature of a Chapter 12 reorganization is a debt extension proceeding, not debt extinction. This debt extension process requires a departure from the approach generally applicable in chapter 7 proceedings that property of the estate be determined as of commencement of the case. Instead, property of the estate for Chapter 12 purposes includes property interests of the debtor during the pendency of the entire case, as well as property rights acquired by the Chapter 12 estate after the commencement of the case. Accordingly, the Section 1207 definition of property of the estate incorporates and expands upon the definition of property of the estate found in Section 541.

In re Bremer, 104 B.R. 999, 1007 (Bankr. W.D. Mo. 1989). Also see, e.g., In re Przybylski, 340 B.R. 624, 627 n.1 (Bankr. E.D. Wis. 2006); In re

Page 14 - MEMORANDUM OPINION

Novak, 252 B.R. 487, 491 (Bankr. D.N. Dak. 2000); First Nat'l Bank v. Hopwood (In re Hopwood), 124 B.R. 82, 85 (Bankr. E.D. Mo. 1991); In re Foos, 121 B.R. 778, 783 (Bankr. S.D. Ohio (1990); In re Luchenbill, 112 B.R. 204, 216 (Bankr. E.D. Mich. 1990); and In re Bluridg Farms, Inc., 93 B.R. 648, 653 (Bankr. S.D. Iowa 1988). But see In re Nielsen, 86 B.R. 177, 178 (Bankr. E.D. Mo. 1988), applying the majority approach to interpreting § 1325(a)(4) to interpretation of § 1225(a)(4):

> It should be noted that the wording of Section 1225 and Section 1325 is identical. In interpreting the provisions of Chapter 12, courts have often turned to Chapter 13 for guidance because Chapter 12 was closely modeled after the existing Chapter 13 with alterations of provisions that are inappropriate for family farmers. In re Kjerulf, 82 B.R. 123 (Bankr. D. Ore. 1987).

Courts generally have been resistant to the idea that the term "effective date of the plan" can be applied to a postconfirmation plan modification. See, e.g., Forbes v. Forbes (In re Forbes), 215 B.R. 183, 189-90 (8th Cir. BAP 1997), and cases cited therein.

> [T]he effective date of the plan is neither determined nor redetermined at the point of postconfirmation modification....[T]here is only one plan to which the Code refers. Regarding the effective date of the plan, there is only one plan. The effective date is not altered by modification of the plan, for the modified plan remains, ever constant, the plan.

In In re Allen, 240 B.R. 231 (Bankr. W.D. Va. 1999), faced with separate issues regarding valuation of collateral and determining the appropriate discount factor to apply with respect to a secured creditor's allowed claim under § 1325(a)(5), the bankruptcy court came in effect to two different conclusions as to the application of the "effective date of the plan." Echoing the majority § 1325(a)(4) view, the court determined

Page 15 - MEMORANDUM OPINION

that it was appropriate to value secured creditor collateral as of the petition date because, among other reasons, "the filing date is the one which alters the rights otherwise possessed by the secured creditor under its documentation and state law to repossess the collateral, liquidate it and apply the sale proceeds to the debt." Id. at 237.  However, the court considered the "key factors" in its present value determination to be "the amount, if any, to be distributed immediately upon confirmation, the amount and timing of any payments to be made over a period of time, and the applicable interest rate necessary to establish appropriate present value of those payments." Id. at 237.  In light of these considerations, the bankruptcy court held that the "effective date of the plan" meant the final hearing date for plan confirmation "because that is the date on which the most currently valid information will be available to the parties and the Court to determine the present value of the payment, payments and/or stream of payments to be made by the Debtor or the Trustee to the creditor in satisfaction of its interest." Id. at 238.  See also In re Milleson, 83 B.R. 696, 699 (Bankr. D. Neb. 1988). In coming to its conclusions, the court in Allen made the following, common sense observations:

> Because [in using the term "effective date of the plan"] the drafters of the Code could easily have designated something quite specific such as the date of filing or the date of confirmation, it may be that the term was intended to be a phrase of art to be determined on a case-by-case basis depending upon each case's particular circumstances.

In re Allen, 240 B.R. at 236.

Post-BAPCPA, at least one court has determined that a debtor's household size for "applicable commitment period" purposes is to be

Page 16 - MEMORANDUM OPINION

determined at the plan confirmation date, as the "effective date of the plan." In re Anderson, 2007 WL 1112925 (Bankr. D. Kan. April 13, 2007). While the bankruptcy court in Anderson relied on prior authority within its district for that conclusion, without analysis, it does provide some useful suggestions for deciding how the term "effective date of the plan" in relation to "applicable commitment period" in § 1325(b)(1) should be interpreted.

> Under BAPCPA, current monthly income cannot be amended during the case because it is based on concrete historical data. No such restriction exists in the Code regarding household size.

Id.

Fed. R. Bankr. P. 1009(a) allows a debtor to amend the petition, schedules and statements filed with the court "as a matter of course at any time before the case is closed." The rule does not restrict the right to amend the B22C. Absent bad faith, such amendments are to be liberally allowed. See Arnold v. Gill (In re Arnold), 252 B.R. 778, 784 (9th Cir. BAP 2000).

In interpreting the term "effective date of the plan" in § 1325(b)(1), in the absence of a definition provided by Congress, either in the Bankruptcy Code itself or in its legislative history, it is appropriate to apply a logical meaning to the term based on common language usage.

> When interpreting an undefined term appearing in a statute, a court first looks to the plain meaning of the words used. When further guidance as to the meaning of a word is needed, the court may then consult the legislative history of the statute. When the legislative history does not reveal the appropriate meaning, it is helpful to resort to

Page 17 - MEMORANDUM OPINION

dictionaries and apply the common meaning of the term. Cassman v. U.S., 31 F.2d at 125.

> "Effective" in common parlance means "ready for service or action; to effect." "Effect" in turn means "a quality or state of being operative." Webster's New Collegiate Dictionary (1975). Both logically and by definition, the effective date of a plan cannot exist before the date the plan is filed. In other words, a plan cannot be "ready for action" or "operative" before its exists.

In re Musil, 99 B.R. 448, 450 (Bankr. D. Kan. 1988).

A chapter 13 plan generally is filed early in a chapter 13 case, but it further does not bind the debtor or other interested parties until it is confirmed. Section 1327(a) specifically provides that:

> The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.

Since the plan is not binding on the debtor and creditors in chapter 13 until it is confirmed, and a debtor may amend the B22C freely to recalculate the "applicable commitment period" as appropriate postpetition, I find that it is most logical to interpret the term "effective date of the plan," as it is used in § 1325(b)(1), to mean the date that the plan is confirmed.[4] To interpret "effective date of the plan" otherwise in this context would give the plan "effect" before it finally is approved as a binding covenant between debtors and their creditors.

---

[4] In this Memorandum Opinion, I do not address the meaning of the "effective date of the plan" with respect to any other section of the Bankruptcy Code where that term is used.

Page 18 - MEMORANDUM OPINION

## Conclusion

In light of the foregoing, I find that at the time of the hearing on the Trustee's objections to the Plan, the Debtors had a household of three, including the two Debtors and their one and one-half year-old son, but not appropriately including the Debtors' unborn child. As such, the applicable commitment period presently is five years. Accordingly, I will sustain the Trustee's objections to the Debtors' plan and enter a 28-day order to allow the Debtors to file a modified plan. Nothing in this memorandum opinion shall preclude the Debtors from amending their B22C if circumstances change in advance of confirmation.[5]

###

cc: Todd Trierweiler
Brian D. Lynch, Trustee

---

[5] In interpreting the term "effective date of the plan," as used in § 1325(b)(1), as synonymous with plan confirmation, I am applying the term in the way that I find most consistent with the provisions of the Bankruptcy Code, but I am mindful that this interpretation may increase the investigative and administrative burdens on the Trustee. If an increase in household size results in a calculation of the "applicable commitment period" that reduces it from five years to three, debtors and their counsel generally can be counted on to amend their B22C's to obtain the benefit of the household increase preconfirmation.

However, households don't just increase in size. They also decrease. For example, debtors providing housing and care to an elderly relative after a stroke as of the petition date suddenly could find themselves with a smaller household in the event of such relative's death.

In a household decrease situation, where the lower household number would push the debtors from a three-year to a five-year applicable commitment period, debtors have no incentive to amend their B22C's. Trustees may have to incorporate a question(s) concerning current or projected decreases (or increases) in household size into their § 341(a) examinations of chapter 13 debtors and/or take other steps in order to ascertain currently accurate household size as of the confirmation date.

Page 19 - MEMORANDUM OPINION